2023R00370/MHS/RM

FILED
FEB 1 6 2024
AT 8:30 \_\_\_\_\_ 5:00 P M
CLERK, U.S. DISTRICT COURT - DNJ

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael E. Farbiarz |
| | : | |
| v. | : | Crim. No. 24-99 (MEF) |
| | : | |
| RAHEEL NAVIWALA | : | 18 U.S.C. § 1349 |
| | | 18 U.S.C. § 1347 |
| | | 18 U.S.C. § 1343 |
| | | 18 U.S.C. § 371 |
| | | 42 U.S.C. § 1320a-7b(b)(1)(A) |
| | | 18 U.S.C. § 2 |

**I N D I C T M E N T**

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as follows:

**COUNT ONE**
**(Conspiracy to Commit Health Care Fraud and Wire Fraud)**

1. Unless otherwise indicated, at all times relevant to this Indictment:

**Relevant Individuals and Entities**

a. RAHEEL NAVIWALA ("NAVIWALA") was a resident of Florida who owned, operated, and/or had a financial or controlling interest in supply companies, including "the Prudent Group" and "Elite Healthcare Solutions LLC" (collectively, the "NAVIWALA Supply Companies"). NAVIWALA and his coconspirators used the NAVIWALA Supply Companies to generate information and documents amounting to a guarantee that Medicare would reimburse the purchase of durable medical equipment ("DME"), referred to herein as a "completed doctor's order." As that term was used during NAVIWALA's scheme, a completed "doctor's order" ("DO") was comprised of a prospective patient's name, contact information,

insurance information, and a doctor's order or prescription for a DME orthotic brace, such as a knee, ankle, back, wrist, or shoulder brace for that particular patient.

    b.  Coconspirators Aaron Williamsky ("Williamsky") and Nadia Levit ("Levit"), not charged in this Indictment, were residents of New Jersey who owned, operated, and/or had a financial or controlling interest in several DME supply companies (the "Williamsky/Levit DME Companies"), which primarily supplied DME to Medicare beneficiaries. The Williamsky/Levit DME Companies were enrolled with Medicare as suppliers of DME and were authorized to bill Medicare for the supplying of orthotic braces. Pursuant to the requirements described above, the Williamsky/Levit DME Companies were also responsible for acknowledging that any claims made to Medicare complied with the relevant laws, regulations, and program instructions.

    c.  Coconspirators Charles Burruss ("Burruss") and Armani Adams ("Adams"), not charged in this Indictment, were residents of California who owned, operated, and/or had a financial or controlling interest in several DME supply companies (the "Burruss/Adams DME Companies"), which primarily supplied DME to Medicare beneficiaries. The Burruss/Adams DME Companies were enrolled with Medicare as suppliers of DME and were authorized to bill Medicare for the supplying of orthotic braces. Pursuant to the requirements described above, the Burruss/Adams DME Companies were also responsible for acknowledging that any claims made to Medicare complied with the relevant laws, regulations, and program instructions. DME Company 1, DME Company 2, DME Company 3, DME Company 4, and DME Company 5 were Burruss/Adams DME Companies. The Williamsky/Levit DME

Companies and the Burruss/Adams DME Companies will be referred to collectively as the "Subject DME Companies."

      d.    As described more fully below, NAVIWALA entered into arrangements with Williamsky, Levit, Burruss, Adams, and others whereby the Subject DME Companies paid kickbacks and bribes to the NAVIWALA Supply Companies in exchange for the NAVIWALA Supply Companies providing them with completed doctors' orders for DME, which the Subject DME Companies would then bill to, and be reimbursed by, Medicare and other health care benefit programs, without regard for medical necessity.

### Background on the Medicare Program

      a.    Medicare was a federally funded program established to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who receive benefits under Medicare were referred to as "Medicare beneficiaries."

      b.    Medicare was administered by the Center for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

      c.    Medicare was divided into four parts, which helped cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

      d.    Medicare Part B covered non-institutional care that included physician services and supplies, such as DME that were needed to diagnose or treat medical conditions and that met accepted standards of medical practice.

3

e. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

f. In order for a supplier of DME services to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

g. As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier had to meet certain standards to obtain and retain billing privileges to Medicare, such as, but not limited to, the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute ("AKS") (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

## TRICARE

a. TRICARE was a health care program of the United States Department of Defense ("DoD") Military Health System that provided coverage for

DoD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.

        b.      TRICARE was a "health care benefit program," as defined by Title 18, United States Code, § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, § 1320a-7b(f), that affected commerce.

## CHAMPVA

        a.      The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

        b.      In general, the CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims had to have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them.

c.      CHAMPVA was a "health care benefit program," as defined by Title 18, United States Code, § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, § 1320a-7b(f), that affected commerce.

### Telemedicine

a.      Telemedicine allows health care providers to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by using telecommunications technology, such as the internet or telephone to interact with a patient.

b.      Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met. These requirements included, among others, that: (a) the beneficiary was located in a rural area (outside a metropolitan area or in a rural health professional shortage area); (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a licensed provider's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

c.      Telehealth services could be covered by, and were reimbursable under, Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

### The Conspiracy

2. From in or around February 2017 through in or around April 2019, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

did knowingly and intentionally conspire and agree with Williamsky, Levit, Burruss, Adams, and others to commit certain offenses, namely:

    a. To knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347; and

    b. To devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

### Goal of the Conspiracy

3. The goal of the conspiracy was for NAVIWALA and others to obtain millions of dollars by submitting or causing the submission of false and fraudulent claims to Medicare and other federal and private health care benefit programs.

### Manner and Means

4.  The manner and means by which NAVIWALA and others sought to accomplish the object of the conspiracy included, among other things, the following:

   a.  From at least as early as in or around February 2015 through in or around April 2019, Williamsky, Levit, Adams, Burruss, and others began purchasing and establishing DME companies, including the Subject DME Companies, in or around New Jersey, New York, and elsewhere to fraudulently bill health care benefit programs, such as Medicare, for various orthotic braces.

   b.  Through the Subject DME Companies, and/or other billing companies, Williamsky, Levit, Burruss, Adams, and others submitted and/or caused the submission of false or fraudulent claims to Medicare and other federal and private health care benefit programs for orthotic braces that were: (1) not medically necessary; (2) never requested by a Medicare beneficiary; (3) never received by a Medicare beneficiary; and/or (4) provided based on a physician order procured through the payment of kickbacks and bribes.

   c.  From at least as early as in or around February 2017 through in or around April 2019, the Subject DME Companies entered into kickback agreements with a number of individuals and entities who were able to generate completed doctors' orders (the "DME Suppliers"). The Subject DME Companies paid the DME Suppliers, including NAVIWALA, kickbacks ranging from approximately $125 to $450 for each completed doctors' order.

   d.  NAVIWALA and others sold completed doctors' orders from the NAVIWALA Supply Companies to the Subject DME Companies, and others, located in New Jersey and elsewhere. NAVIWALA and his co-conspirators received

approximately $260 for each completed doctor's order depending upon whether the DME was for the knee, ankle, wrist, back, or shoulder.

   e. In general, the DME Suppliers obtained completed doctors' orders for DME for beneficiaries located in the United States and elsewhere through the use of marketing call centers and telemedicine companies with whom they had relationships.

   f. To conceal the payment of kickbacks, the Subject DME Companies entered into sham "Marketing, Business Process Outsourcing and Call Center" agreements ("Marketing Agreements") with the DME Suppliers to disguise kickback and bribe payments for the completed doctors' orders for orthotic braces for Medicare beneficiaries generated by the DME Suppliers. According to the Marketing Agreements between the Subject DME Companies and the DME Suppliers, the DME Suppliers were to provide "raw leads" generated from various advertising campaigns for orthotic braces. According to the agreements, these raw leads were to consist only of information of individuals responding to the advertisements indicating an interest in orthotic braces. In reality, however, the DME Suppliers provided Williamsky, Levit, Burruss, Adams, and others affiliated with their DME Companies with completed doctors' orders and not "raw leads."

   g. Once the Subject DME Companies received the completed doctors' orders from the DME Suppliers, they arranged for the shipping of the ordered orthotic brace(s) to the beneficiary and electronically submitted and/or caused the

9

electronic submission of a claim to Medicare and/or other federal and private health care benefit programs for payment.

    h. Based on the submission of these claims, the Subject DME Companies received from Medicare and/or other federal and private health care benefit programs payments that they were not entitled to receive.

    i. As a result of NAVIWALA's participation in the health care fraud kickback scheme, from in or around February 2017 through in or around April 2019, NAVIWALA and his co-conspirators caused a loss to Medicare of at least approximately $97,514,936.21.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FOUR
## (Health Care Fraud)

5.  The allegations in Paragraphs 1, 3, and 4 of this Indictment are hereby incorporated and re-alleged as if set forth fully here.

6.  On or about the dates listed below, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

knowingly and willfully executed a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, as follows:

| Count | Approx. Date | Execution |
|---|---|---|
| 2 | February 28, 2019 | The Defendant caused DME Company 1 to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 1 |
| 3 | March 18, 2019 | The Defendant caused DME Company 2 to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 2 |
| 4 | February 28, 2019 | The Defendant caused DME Company 3 to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 3. |

In violation of Title 18, United States Code, Section 1347, and Title 18, United States Code, Section 2.

## COUNTS FIVE AND SIX
## (Wire Fraud)

7. The allegations in Paragraphs 1, 3, and 4 of this Indictment are incorporated and re-alleged as if set forth fully here.

8. On or about the dates listed below, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly and with fraudulent intent transmit and cause to be transmitted by means of wire communications in interstate commerce the following writings, signs, signals, pictures and sounds:

| Count | Approx. Date | From | To | Interstate Wire Transmission |
|---|---|---|---|---|
| 5 | March 7, 2019 | DME Company 5 | Elite Healthcare Solutions LLC | Transfer of $200,000 via ACH debit |
| 6 | March 21, 2019 | DME Company 5 | Elite Healthcare Solutions LLC | Transfer of $200,000 via ACH debit |

In violation of Title 18, United States Code, Section 1343, and Title 18, United States Code, Section 2.

## COUNT SEVEN
## (Conspiracy to Violate the Federal Anti-Kickback Statute)

9. The allegations in Paragraphs 1, 3, and 4 of this Indictment are hereby incorporated and re-alleged as if set forth fully here.

10. From in or around February 2017 through in or around April 2019, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

did knowingly and intentionally conspire and agree with Williamsky, Levit, Burruss, Adams, and others to commit offenses against the United States, namely,

    a. to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, for which payment may be made in whole or in part under a Federal health care program, as defined in Title 42, United States Code, Section 1320a-7b(f), namely, Medicare, TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

    b. to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service, for which payment may be made in whole and in part under a Federal health care program, namely, Medicare, TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

13

## Goal of the Conspiracy

11. The goal of the conspiracy was for NAVIWALA and co-conspirators to unlawfully enrich themselves by soliciting and receiving kickbacks and bribes from DME companies for the referral of Medicare beneficiaries for DME to the Subject DME Companies and others, for which the DME companies billed to, and obtained payments from, Medicare and other federal health care benefit programs.

## Manner and Means of the Conspiracy

12. The manner and means by which NAVIWALA and others sought to accomplish the object of the conspiracy included, among other things, the following:

    a. As described in Paragraphs 3 and 4 of this Indictment, NAVIWALA entered into kickback arrangements with Williamsky, Levit, Burruss, Adams, and others. Pursuant to those arrangements, NAVIWALA and his co-conspirators solicited and received kickbacks for each doctors' order for DME provided to the Subject DME Companies. To conceal the payment of kickbacks, the Subject DME Companies entered into sham Marketing Agreements with NAVIWALA and others.

    b. As a result of NAVIWALA's participation in the health care fraud kickback scheme, from in or around February 2017 through in or around April 2019, NAVIWALA and his co-conspirators caused a loss to Medicare and other federal health care benefit programs of at least approximately $97,514,936.21.

14

## Overt Acts

13. In furtherance of the conspiracy, and in order to effect the object thereof, NAVIWALA and others committed or caused the commission of the following overt acts in the District of New Jersey and elsewhere:

    a. On or about April 10, 2018, the Prudent Group issued an invoice to DME Company 4 falsely reflecting a line item of 100 marketing hours billed at $500.00 per hour, when in fact the Prudent Group was paid on a per-brace basis.

    b. On or about April 13, 2018, the Prudent Group issued an invoice to DME Company 3 falsely reflecting a line item of 100 marketing hours billed at $500.00 per hour, when in fact the Prudent Group was paid on a per-brace basis.

    c. On or about April 13, 2018, the Prudent Group issued an invoice to DME Company 5 falsely reflecting a line item of 100 marketing hours billed at $500.00 per hour, when in fact the Prudent Group was paid on a per-brace basis.

    d. On or about July 25, 2018, Williamsky and Levit, based in New Jersey, caused one of the Williamsky/Levit DME Companies based in New Jersey to provide NAVIWALA kickbacks of approximately $50,000 in exchange for completed doctors' orders for DME.

    e. On or about August 22, 2018, Williamsky and Levit, based in New Jersey, caused one of the Williamsky/Levit DME Companies based in New Jersey to provide NAVIWALA kickbacks of approximately $40,000 in exchange for completed doctors' orders for DME.

    f. From on or about September 12, 2018, through on or about November 7, 2018, Williamsky and Levit, based in New Jersey, caused one of the

Williamsky/Levit DME Companies based in New Jersey to provide NAVIWALA kickbacks of approximately $550,000 in exchange for completed doctors' orders for DME.

  g. On or about February 21, 2019, Burruss/Adams and/or DME Company 1 caused the transfer of $200,000 to Elite Healthcare Solutions LLC in exchange for completed doctors' orders for DME.

  h. On or about March 12, 2019, Burruss/Adams and/or DME Company 2 caused the transfer of $200,000 to Elite Healthcare Solutions LLC in exchange for completed doctors' orders for DME.

  i. On or about March 12, 2019, Burruss/Adams and/or DME Company 3 caused the transfer of $200,000 to Elite Healthcare Solutions LLC in exchange for completed doctors' orders for DME.

In violation of Title 18, United States Code, Section 371.

## COUNT EIGHT THROUGH TEN
## (Violations of the Anti-Kickback Statute)

14. The allegations in Paragraphs 1, 3, 4, and 11 through 13 of this Indictment are incorporated and re-alleged as if set forth fully here.

15. On or about the dates listed below, in the District of New Jersey, and elsewhere, the defendant,

### RAHEEL NAVIWALA,

did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in the manner specified below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a federal health care program:

| Count | Approx. Date | Execution |
|---|---|---|
| 8 | February 21, 2019 | Transfer of $200,000 from DME Company 1 to Elite Healthcare Solutions LLC |
| 9 | March 12, 2019 | Transfer of $200,000 from DME Company 2 to Elite Healthcare Solutions LLC |
| 10 | March 12, 2019 | Transfer of $200,000 from DME Company 3 to Elite Healthcare Solutions LLC |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS AS TO COUNTS ONE THROUGH FOUR AND SEVEN THROUGH TEN

1. Upon conviction of the Federal health care offenses (as defined in 18 U.S.C. § 24) alleged in Counts One through Four and Seven through Ten of this Indictment, the defendant, RAHEEL NAVIWALA, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses (as defined in 18 U.S.C. § 24) alleged in Counts One through Four and Seven through Ten of this Indictment.

## FORFEITURE ALLEGATIONS AS TO COUNTS FIVE AND SIX

2. As a result of committing the wire fraud offenses charged in Counts Five and Six of this Indictment, the defendant, RAHEEL NAVIWALA, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the violations of Title 18, United States Code, Sections 1349 and 1343, and all property traceable thereto, alleged in Counts Five and Six of this Indictment.

## SUBSTITUTE ASSETS PROVISION
### (Applicable to All Forfeiture Allegations)

3. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third person;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

*Vikas Khanna*
VIKAS KHANNA
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


FOREPERSON

CASE NUMBER: 24-99 (MEF

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

RAHEEL NAVIWALA

## INDICTMENT FOR

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 1343
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2

A True Bill,



Foreperson

VIKAS KHANNA
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED BY
28 U.S.C. § 515

MATTHEW SPECHT
RAY MATEO
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
(973) 353-6061