2023R00370/EKL/MHS/ALW

FILED

JAN - 3 2025

AT 8:30    11:11 A  M
CLERK, U.S. DISTRICT COURT - DNJ

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael E. Farbiarz |
| | : | |
| | : | Crim. No. 24-99 |
| v. | : | |
| | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 1347 |
| RAHEEL NAVIWALA | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 371 |
| | : | 42 U.S.C. § 1320a-7b(b)(1)(A) |
| | : | 18 U.S.C. § 2 |

### S U P E R S E D I N G   I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at

Newark, charges as follows:

### COUNT ONE
### (Conspiracy to Commit Health Care Fraud and Wire Fraud)

1.      Unless otherwise indicated, at all times relevant to this Superseding

Indictment:

### Relevant Individuals and Entities

a.      RAHEEL NAVIWALA ("NAVIWALA") was a resident of Florida

who owned, operated, and/or had a financial or controlling interest in certain supply

companies, including the Prudent Group, Inc. and Elite Healthcare Solutions LLC

(collectively, the "NAVIWALA Supply Companies"). NAVIWALA and his

coconspirators used the NAVIWALA Supply Companies to generate information

and documents amounting to a guarantee that Medicare would reimburse the

purchase of durable medical equipment ("DME"), referred to herein as a "completed

doctor's order." As that term was used during NAVIWALA's scheme, a completed

doctor's order ("DO") was comprised of a prospective patient's name, contact

information, insurance information, and a prescription for a DME orthotic brace,

such as a knee, ankle, back, wrist, or shoulder brace for that particular patient.

      b.    Coconspirators Aaron Williamsky ("Williamsky") and Nadia

Levit ("Levit"), not charged in this Superseding Indictment, were residents of New

Jersey who owned, operated, and/or had a financial or controlling interest in several

DME supply companies (the "Williamsky/Levit DME Companies"), certain of which

were located in or around Morganville, Holmdel, Brick, and Matawan, New Jersey,

and which primarily supplied DME to Medicare beneficiaries. The Williamsky/Levit

DME Companies were enrolled with Medicare as suppliers of DME and were

authorized to bill Medicare for supplying orthotic braces. Pursuant to applicable

requirements, the Williamsky/Levit DME Companies were also responsible for

acknowledging that any claims made to Medicare complied with the relevant laws,

regulations, and program instructions. Williamsky and Levit also used New Jersey-

based companies to manage the Williamsky/Levit DME Companies.

      c.    Coconspirators Charles Burruss ("Burruss") and Armani Adams

("Adams"), not charged in this Superseding Indictment, were residents of California

who owned, operated, and/or had a financial or controlling interest in several DME

supply companies (the "Burruss/Adams DME Companies"), which primarily

supplied DME to Medicare beneficiaries. The Burruss/Adams DME Companies were

enrolled with Medicare as suppliers of DME and were authorized to bill Medicare

for supplying orthotic braces. Pursuant to applicable requirements, the

Burruss/Adams DME Companies were also responsible for acknowledging that any

claims made to Medicare complied with the relevant laws, regulations, and program

instructions. DME Company 1, DME Company 2, DME Company 3, DME Company 4, and DME Company 5 were Burruss/Adams DME Companies.

      d.    Coconspirator Ken Pitter ("Pitter"), not charged in this Superseding Indictment, was a resident of Florida who owned, operated, and/or had a financial or controlling interest in several DME supply companies (the "Pitter DME Companies"), which primarily supplied DME to Medicare beneficiaries. The Pitter DME Companies were enrolled with Medicare as suppliers of DME and were authorized to bill Medicare for supplying orthotic braces. Pursuant to applicable requirements, the Pitter DME Companies were also responsible for acknowledging that any claims made to Medicare complied with the relevant laws, regulations, and program instructions.

      e.    The Williamsky/Levit DME Companies, the Burruss/Adams DME Companies, and the Pitter DME Companies are referred to collectively herein as the "Subject DME Companies."

      f.    NAVIWALA also owned, operated, and/or had a financial or controlling interest in DME supply companies (the "NAVIWALA DME Companies"), which primarily supplied DME to Medicare beneficiaries. At least one of the NAVIWALA DME Companies was enrolled with Medicare as a supplier of DME and was authorized to bill Medicare for supplying orthotic braces. Pursuant to applicable requirements, at least one of the NAVIWALA DME Companies was also responsible for acknowledging that any claims which that NAVIWALA DME

Company made to Medicare complied with the relevant laws, regulations, and program instructions.

g.    As described more fully below, NAVIWALA entered into arrangements with Williamsky, Levit, Burruss, Adams, Pitter, and others whereby the Subject DME Companies paid kickbacks and bribes to the NAVIWALA Supply Companies. In exchange, the NAVIWALA Supply Companies provided them with completed DOs for DME, which the Subject DME Companies would then bill to, and be reimbursed by, Medicare and other health care benefit programs, without regard for medical necessity.

h.    The Federal Reserve Bank operated the Federal Wire Transfer Network ("Fedwire"), which is an electronic funds-transfer system used primarily for the transmission and settlement of certain payment orders.

i.    At all times relevant to this Superseding Indictment, all Fedwire wire transfers were processed in a way that caused an electronic communication to travel through a Federal Reserve facility in New Jersey.

### Background on the Medicare Program

j.    Medicare was a federally funded program established to provide medical insurance benefits for individuals aged 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who receive benefits under Medicare were referred to as "Medicare beneficiaries."

k.    Medicare was administered by the Center for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

4

l. Medicare was divided into four parts, which helped cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

m. Medicare Part B covered non-institutional care that included physician services and supplies, such as DME that were needed to diagnose or treat medical conditions and that met accepted standards of medical practice.

n. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f), that affected commerce.

o. In order for a supplier of DME services to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

p. As provided in the Form CMS-855S, to enroll as a DME supplier, every supplier had to meet certain standards to obtain and retain billing privileges to Medicare, such as, but not limited to, the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute ("AKS") (Title 42, United States Code, Section 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare was

5

conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

## TRICARE

q.     TRICARE was a health care program of the United States Department of Defense ("DoD") Military Health System that provided coverage for DoD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.

r.     TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f), that affected commerce.

6

## CHAMPVA

s.    The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

t.    In general, the CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims had to have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them.

u.    CHAMPVA was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f), that affected commerce.

## Telemedicine

v.    Telemedicine allowed health care providers to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by

7

using telecommunications technology, such as the internet or telephone to interact with a patient.

w.    Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met. These requirements included, among others, that: (a) the beneficiary was located in a rural area (outside a metropolitan area or in a rural health professional shortage area); (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a licensed provider's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

x.    Telehealth services could be covered by, and were reimbursable under, Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

### The Conspiracy

2.      From in or around February 2017 through in or around April 2019, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

did knowingly and intentionally conspire and agree with Williamsky, Levit, Burruss, Adams, Pitter, and others to commit certain offenses, namely:

a.      to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347; and

b.      to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

### Goal of the Conspiracy

3.      The goal of the conspiracy was for NAVIWALA and his coconspirators to obtain millions of dollars by submitting or causing the submission of false and

9

fraudulent claims to Medicare and other federal and private health care benefit programs.

## **Manner and Means**

4.     It was part of the conspiracy that:

a.     From at least as early as in or around February 2015 through in or around April 2019, Williamsky, Levit, Adams, Burruss, Pitter, and others began purchasing and establishing DME companies, including the Subject DME Companies, in or around New Jersey, New York, and elsewhere to fraudulently bill health care benefit programs, such as Medicare, for various orthotic braces.

b.     Through the Subject DME Companies, and/or other billing companies, Williamsky, Levit, Burruss, Adams, Pitter, and others submitted and/or caused the submission of false or fraudulent claims to Medicare and other federal and private health care benefit programs for orthotic braces that were: (1) not medically necessary or without regard to medical necessity; (2) never requested by a Medicare beneficiary; (3) never received by a Medicare beneficiary; and/or (4) provided based on a physician order procured through the payment of kickbacks and bribes despite certification of compliance with applicable Medicare requirements.

c.     At least one of the NAVIWALA DME Companies also submitted and/or caused the submission of false or fraudulent claims to Medicare and other federal and private health care benefit programs for orthotic braces that were: (1) not medically necessary or without regard to medical necessity; (2) never requested by a Medicare beneficiary; (3) never received by a Medicare beneficiary;

and/or (4) provided based on a physician order procured through the payment of kickbacks and bribes despite certification of compliance with applicable Medicare requirements.

        d.      From at least as early as in or around February 2017 through in or around April 2019, the Subject DME Companies entered into kickback agreements with a number of individuals and entities, including NAVIWALA and the NAVIWALA Supply Companies, who were able to generate completed DOs (the "DME Suppliers"). The Subject DME Companies paid the DME Suppliers, including NAVIWALA and the NAVIWALA Supply Companies, kickbacks ranging from approximately $125 to $450 for each completed DO.

        e.      NAVIWALA and others sold completed DOs from the NAVIWALA Supply Companies to the Subject DME Companies, and others, located in New Jersey and elsewhere. For example, the NAVIWALA Supply Companies caused patient leads to be sent to the Williamsky/Levit DME Companies in New Jersey, including those located in or around Morganville, Holmdel, Brick, and Matawan. NAVIWALA and his coconspirators received approximately $260 for each completed DO depending upon whether the DME was for the knee, ankle, wrist, back, or shoulder.

        f.      In general, the DME Suppliers obtained completed DOs for DME for beneficiaries located in the United States and elsewhere through the use of marketing call centers and telemedicine companies with whom they had relationships. NAVIWALA and others operated or managed a call center and/or identified beneficiaries whose insurance would pay for DME. At times, the call

center connected beneficiaries to telemedicine companies. In furtherance of the conspiracy, NAVIWALA worked with and paid telemedicine companies to provide prescriptions for orthotic braces that were: (1) not medically necessary or without regard to medical necessity; (2) never requested by a Medicare beneficiary; (3) never received by a Medicare beneficiary; and/or (4) provided based on a physician order procured through the payment of kickbacks and bribes despite certification of compliance with applicable Medicare requirements.

g.    To conceal the payment of kickbacks and bribes, the Subject DME Companies entered into sham "marketing contracts" or "Marketing, Business Process Outsourcing and Call Center" agreements ("Marketing Agreements") with the DME Suppliers to disguise kickback and bribe payments for the completed DOs for orthotic braces for Medicare beneficiaries generated by the DME Suppliers. According to the Marketing Agreements between the Subject DME Companies and the DME Suppliers, the DME Suppliers were to provide "raw leads" generated from various advertising campaigns for orthotic braces and would be paid on an hourly basis. According to the agreements, these raw leads were to consist only of information of individuals responding to the advertisements indicating an interest in orthotic braces. In reality, however, the DME Suppliers provided Williamsky, Levit, Burruss, Adams, Pitter, and others affiliated with their DME Companies with completed DOs and not "raw leads." Further, payments were not actually made on an hourly basis.

h.    Once the Subject DME Companies received the completed DOs from NAVIWALA and the NAVIWALA Supply Companies, they arranged for the

shipping of DME to the beneficiary and electronically submitted and/or caused the electronic submission of a false and fraudulent claim to Medicare and/or other federal and private health care benefit programs for payment.

  i.  Based on the submission of these false and fraudulent claims, the Subject DME Companies received from Medicare and/or other federal and private health care benefit programs payments that they were not entitled to receive.

  j.  During the relevant period, NAVIWALA exchanged text messages with Levit, located in New Jersey, to discuss, among other things: wire payments that Levit was sending NAVIWALA as part of the conspiracy; the amount of such payments, sometimes totaling as much as approximately $200,000; and purported "marketing contracts" used to conceal the true nature of kickbacks and bribes that Levit and others were paying NAVIWALA.

  k.  As a result of the conspiracy, from in or around February 2017 through in or around April 2019, NAVIWALA and his coconspirators caused a loss to Medicare of millions of dollars.

  All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FOUR
### (Health Care Fraud)

1.      The allegations in Paragraphs 1, 3, and 4 of Count One of this

Superseding Indictment are re-alleged here.

2.      On or about the dates listed below, in the District of New Jersey, and

elsewhere, the defendant,

### RAHEEL NAVIWALA,

knowingly and willfully executed a scheme and artifice to defraud a health care

benefit program and to obtain, by means of false and fraudulent pretenses,

representations, and promises, money and property owned by, and under the

custody and control of, a health care benefit program in connection with the delivery

of and payment for health care benefits, items, and services, as follows:

| Count | Approx. Date | Execution |
|---|---|---|
| 2 | February 28, 2019 | NAVIWALA caused DME Company 1 to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 1 for a shipment of DME to New Jersey. |
| 3 | March 18, 2019 | NAVIWALA caused DME Company 2 to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 2 for a shipment of DME to New Jersey. |
| 4 | February 28, 2019 | NAVIWALA caused DME Company 3 to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 3 for a shipment of DME to New Jersey. |

In violation of Title 18, United States Code, Section 1347 and Section 2.

14

## COUNTS FIVE AND SIX
### (Wire Fraud)

1.     The allegations in Paragraphs 1, 3, and 4 of Count One of this Superseding Indictment are re-alleged here.

2.     On or about the dates listed below, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly and with fraudulent intent transmit and cause to be transmitted by means of wire communications in interstate commerce the following writings, signs, signals, pictures, and sounds, which were sent by interstate wire through the District of New Jersey via Fedwire:

| Count | Approx. Date | From | To | Interstate Wire Transmission |
|---|---|---|---|---|
| 5 | March 7, 2019 | DME Company 5 | Elite Healthcare Solutions LLC | Transfer of approximately $200,000 |
| 6 | March 21, 2019 | DME Company 5 | Elite Healthcare Solutions LLC | Transfer of approximately $200,000 |

In violation of Title 18, United States Code, Section 1343 and Section 2.

**COUNT SEVEN**
**(Conspiracy to Violate the Federal Anti-Kickback Statute)**

1.      The allegations in Paragraphs 1, 3, and 4 of Count One of this Superseding Indictment are re-alleged here.

2.      From in or around February 2017 through in or around April 2019, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

did knowingly and intentionally conspire and agree with Williamsky, Levit, Burruss, Adams, Pitter, and others to commit offenses against the United States, namely,

a.      to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, for which payment may be made in whole or in part under a Federal health care program, as defined in Title 42, United States Code, Section 1320a-7b(f), namely, Medicare, TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

b.      to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service, for which payment may be made in whole and in part under a Federal health care program, as defined in Title 42, United States Code, Section 1320a-7b(f), namely, Medicare,

16

TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

### Goal of the Conspiracy

3.    The goal of the conspiracy was for NAVIWALA and his coconspirators to unlawfully enrich themselves by soliciting and receiving kickbacks and bribes from DME companies for the referral of Medicare beneficiaries for DME to the Subject DME Companies and others, for which the DME companies billed to, and obtained payments from, Medicare and other federal health care benefit programs.

### Manner and Means of the Conspiracy

4.    It was part of the conspiracy that:

a.    NAVIWALA entered into kickback arrangements with Williamsky, Levit, Burruss, Adams, Pitter, and others. Pursuant to those arrangements, NAVIWALA and his coconspirators solicited and received kickbacks for each completed DO for DME provided to the Subject DME Companies, including those based in New Jersey. To conceal the payment of kickbacks, the Subject DME Companies entered into sham Marketing Agreements with NAVIWALA and others.

b.    As a result of this conspiracy, from in or around February 2017 through in or around April 2019, NAVIWALA and his coconspirators caused a loss to Medicare and other federal health care benefit programs.

### Overt Acts

5.    In furtherance of the conspiracy, and in order to effect the object thereof, NAVIWALA and others committed or caused the commission of the following overt acts in the District of New Jersey and elsewhere:

a.     On or about April 10, 2018, the Prudent Group issued an invoice to DME Company 4 falsely reflecting a line item of 100 marketing hours billed at $500.00 per hour, when in fact the Prudent Group was paid on a per-brace basis.

b.     On or about April 13, 2018, the Prudent Group issued an invoice to DME Company 3 falsely reflecting a line item of 100 marketing hours billed at $500.00 per hour, when in fact the Prudent Group was paid on a per-brace basis.

c.     On or about April 13, 2018, the Prudent Group issued an invoice to DME Company 5 falsely reflecting a line item of 100 marketing hours billed at $500.00 per hour, when in fact the Prudent Group was paid on a per-brace basis.

d.     On or about July 25, 2018, Williamsky and/or Levit, based in New Jersey, caused one of the Williamsky/Levit DME Companies based in New Jersey to provide NAVIWALA kickbacks of approximately $50,000 in exchange for completed DOs for DME.

e.     On or about August 22, 2018, Williamsky and/or Levit, based in New Jersey, caused one of the Williamsky/Levit DME Companies based in New Jersey to provide NAVIWALA kickbacks of approximately $40,000 in exchange for completed DOs for DME.

f.     From on or about September 12, 2018, through on or about November 7, 2018, Williamsky and Levit, based in New Jersey, caused one of the Williamsky/Levit DME Companies based in New Jersey to provide NAVIWALA kickbacks of approximately $550,000 in exchange for completed DOs for DME.

g.     On or about February 21, 2019, Burruss and/or Adams and/or DME Company 1 caused the transfer of approximately $200,000 to Elite Healthcare

18

Solutions LLC in exchange for completed DOs for DME.

        h.     On or about March 12, 2019, Burruss and/or Adams and/or DME Company 2 caused the transfer of approximately $200,000 to Elite Healthcare Solutions LLC in exchange for completed DOs for DME.

        i.     On or about March 12, 2019, Burruss and/or Adams and/or DME Company 3 caused the transfer of approximately $200,000 to Elite Healthcare Solutions LLC in exchange for completed DOs for DME.

    In violation of Title 18, United States Code, Section 371.

## COUNT EIGHT THROUGH TEN
### (Violations of the Anti-Kickback Statute)

1.      The allegations in Paragraphs 1, 3, and 4 of Count One and Paragraphs 3 through 5 of Count Seven of this Superseding Indictment are re-alleged here.

2.      On or about the dates listed below, in the District of New Jersey, and elsewhere, the defendant,

**RAHEEL NAVIWALA,**

did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in the manner specified below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a federal health care program, which were sent by interstate wire through the District of New Jersey via Fedwire:

| Count | Approx. Date | Execution |
|-------|--------------|-----------|
| 8 | February 21, 2019 | Transfer of approximately $200,000 from DME Company 1 to Elite Healthcare Solutions LLC |
| 9 | March 12, 2019 | Transfer of approximately $200,000 from DME Company 2 to Elite Healthcare Solutions LLC |
| 10 | March 12, 2019 | Transfer of approximately $200,000 from DME Company 3 to Elite Healthcare Solutions LLC |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Section 2.

## FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH FOUR AND SEVEN THROUGH TEN

Upon conviction of the Federal health care offenses (as defined in Title 18, United States Code, Section 24) alleged in Counts One through Four and Seven through Ten of this Superseding Indictment, the defendant, RAHEEL NAVIWALA, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), all property, real or personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses alleged in Counts One through Four and Seven through Ten of this Superseding Indictment.

## FORFEITURE ALLEGATION AS TO COUNTS FIVE AND SIX

As a result of committing the wire fraud offenses alleged in Counts Five and Six of this Superseding Indictment, the defendant, RAHEEL NAVIWALA, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts Five and Six of this Superseding Indictment, and all property traceable thereto.

## SUBSTITUTE ASSETS PROVISION
### (Applicable to All Forfeiture Allegations)

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third person;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.



VIKAS KHANNA
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515

Foreperson

22

CASE NUMBER: ___ 24-CR-99

**United States District Court**
**District of New Jersey**

UNITED STATES OF AMERICA

v.

RAHEEL NAVIWALA

**SUPERSEDING INDICTMENT FOR**

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 1343
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2

A True Bill



Foreperson

VIKAS KHANNA
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED BY
28 U.S.C. § 515

ELAINE K. LOU
MATTHEW SPECHT
AARON L. WEBMAN
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY